UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CAUSE NO. 1:08-CR-337-LY-1 |
| | § | |
| GEORGE LEWIS ESCAMILLA, SR. | § | |

**EMERGENCY MOTION FOR REDUCTION IN SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

TO THE HONORABLE LEE YEAKEL, UNITED STATES DISTRICT JUDGE:

George Lewis Escamilla, Sr., respectfully moves this Court, under 18 U.S.C. § 3582(c)(1)(A) as amended by the First Step Act of 2018,[1] to reduce his sentence to time-served. He makes this request based on the "extraordinary and compelling reasons" presented by his current COVID-19 infection and hospitalization, which is a "serious" and/or potentially "terminal" condition, exacerbated by his age and serious underlying medical conditions. *See* U.S.S.G. § 1B.13, comment. (n.1).

Mr. Escamilla is 67 years old and suffers from diabetes, high blood pressure, and anemia.[2] He is a double amputee and wheel-chair bound. He is serving his sentence at FCI Oakdale, one of the Bureau of Prisons facilities most impacted by the COVID-19 pandemic.[3] According to the BOP's website, as of April 21, 2020, 29 inmates and 22 staff members have tested positive for

---

[1] *See* Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018).

[2] Counsel has requested medical records. Some of Mr. Escamilla's medical history is documented in the Presentence Investigation Report (PSR). *See* Docket Entry June 11, 2009.

[3] *See* Janet Reitman, *'Something is Going to Explode': When Coronavirus Strikes a Prison* (Apr. 18, 2020), https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html (last accessed Apr. 19, 2020) (documenting the coronavirus outbreak at FCI Oakdale, including the staff and inmates observations regarding lack of directive, protocol, and equipment).

COVID-19 at the facilities located at the Oakdale Federal Corrections Complex.[4] This number likely underrepresents the actual number of infections, as testing has been limited.[5]  The conditions at FCI Oakdale from COVID-19 are indeed grave:

- "Wayne Pelaggi lies awake at night listening to inmates' coughs bounce off the prison walls. He sees fellow inmates collapse, then disappear with medical staff on an electric cart. His own aches and exhaustion make him fear he will not make it to his release date in a year."[6]

- "A prisoner in the "Camp" facility at Oakdale told counsel that bunks are three feet away from each other; there is no access to hot water or soap; and there are eight showers for over 130 prisoners with no indication of tiered showering to improve social distancing."[7]

- "A prisoner at the FCI Oakdale I building reported access to hot water and soap, but not hand sanitizer; laundry only once per week; and eight toilets, 15 urinals, and 24 showers for all prisoners, again without an indication of procedures to ensure distancing."[8]

 On April 15, it was reported "twenty inmates were hospitalized. Fifty-six inmates had tested positive for Covid-19. Thirty-two staff members had tested positive, along with three of their family members."[9] The conditions are dire: "It's been simultaneous, just people getting sick back to back to back to back," stated Corey Trammel, a FCI Oakdale union representative for guards.[10] Seven inmates have died in the last three weeks. By the third week of April, "[a]t least

---

[4] Oakdale Federal Corrections Complex consists of two main prisons, FCI Oakdale I and II, and a minimum security satellite camp that is part of the FCI Oakdale II complex. Based on the information available to Counsel, it appears Mr. Escamilla was housed at the satellite camp prior to being hospitalized.

[5] Bureau officials acknowledge, for FCI Oakdale at least, "only those ill enough to be taken to a hospital are tested for the coronavirus." Kimberly Kindy, *Inside the deadliest federal prison, the seeping coronavirus creates fear and danger* (Apr. 10, 2020), https://www.washingtonpost.com/national/inside-the-deadliest-federal-prison-the-seeping-coronavirus-creates-fear-and-danger/2020/04/09/deeceb6e-75b4-11ea-a9bd-9f8b593300d0_story.html (last accessed Apr. 22, 2020).

[6] *Id.*

[7] Petition for Writ of Habeas Corpus ¶ 51, *Livas et. al. v. Myers*, 1:20-cv-0422 (W.D. La. Apr. 6, 2020), ECF No. 1.

[8] *Id.*

[9] *See* Janet Reitman, *'Something is Going to Explode': When Coronavirus Strikes a Prison* (Apr. 18, 2020), https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html (last accessed Apr. 19, 2020) (documenting the coronavirus outbreak at FCI Oakdale, including the staff and inmates observations regarding lack of directive, protocol, and equipment).

[10] Kimberly Kindy, *An explosion of coronavirus cases cripples a federal prison in Louisiana* (Mar. 29, 2020), https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html (last accessed Apr. 22, 2020).

100 inmates and staff members [have] been infected, with more than 20 hospitalized, as confusion, fear and anger grip[] the interconnected community of inmates, officials, workers, family members, and loved ones."[11] Now, Mr. Escamilla is one of these statistics: he has COVID-19 and is currently being held at an unknown hospital near Oakdale Federal Corrections Complex in Louisiana.

Presumably based on his high-risk factors, poor health, and age, the Bureau of Prisons developed a release plan for Mr. Escamilla to serve out the remainder of his sentence under home confinement.[12] On March 18, 2020, Mr. Escamilla called his son, Michael, from prison and with a case manager present, instructed Michael to fax his driver's license, vehicle registration, and insurance information to the facility. Michael was further told to get a land line installed. On April 9, Michael received a visit from a caseworker with the Austin Reentry Center. The caseworker executed a home confinement checklist with Michael and told Michael that Michael Abrams would be his father's case worker at the Reentry Center.  Mr. Escamilla phoned his son later to tell him he needed to be picked up from Oakdale on May 6, 2020. But sometime between the release plan's implementation and the filing of this motion, Mr. Escamilla contracted COVID-19 and was hospitalized at an undisclosed location near Oakdale, Louisiana.[13]

While other inmates around the country are being released based on their risk of contracting COVID-19, Mr. Escamilla is now hospitalized with COVID-19. His family has been unable to

---

[11] *See* Janet Reitman, *'Something is Going to Explode': When Coronavirus Strikes a Prison* (Apr. 18, 2020), https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html (last accessed Apr. 19, 2020) (documenting the coronavirus outbreak at FCI Oakdale, including the staff and inmates observations regarding lack of directive, protocol, and equipment).

[12] Mr. Escamilla's current projected release date as reported on BOP.gov is May 14, 2022.

[13] On March 27, US Probation in Austin denied the BOP's request to allow Mr. Escamilla to participate in the federal location monitoring program.  On April 24, 2020, US Probation Officer Bartosz Szatkowski, who is the specialist in charge of the program, told counsel the denial was categorical.  That is, U.S. Probation, as a matter of policy, does not accept BOP requests to monitor inmates on home confinement.  In addition, because Mr. Escamilla lacks ankles for the attachment of an electronic monitor, such location monitoring would be impractical to enforce home confinement.

obtain any information regarding Mr. Escamilla's status.  Regional counsel for the BOP, Mr. Jason Sickler, explained to the undersigned that only persons designated by an inmate on a BOP form to be contacted in the event of serious or terminal illness could be notified as necessary.  Apart from saying that Mr. Escamilla was not on a respirator, Mr. Sickler could not release more medical information.

Mr. Escamilla has served approximately 11 years and 7 months of his 16-year sentence. His underlying offense did not involve violence. And, he does not pose a danger to the community, especially now given his many and serious medical afflictions and battle with COVID-19. He has a supportive family and a home to stay in should he be released that was approved by the Austin Reentry Center. Given the extraordinary circumstances surrounding his own battle with COVID-19, Mr. Escamilla asks the Court to waive the 30-day waiting period for a response by the warden.[14]

Mr. Escamilla also asks the Court to consider this motion on an expedited basis as his continued incarceration places the community at a higher risk and, his medical treatment would be better served with the input and involvement of his family, who have been unable to obtain information about his condition. Counsel asks the Court to order that Mr. Escamilla's sentence be reduced to time-served, followed by the previously imposed 5-year term of supervised release.

I.   **Courts have authority, under the First Step Act, to grant compassionate release when "extraordinary and compelling reasons" warrant it.**

---

[14] The Warden already deemed Mr. Escamilla worthy of home confinement before Mr. Escamilla became infected with COVID-19. Mr. Escamilla's current hospitalization with COVID-19 only reinforces his eligibility for immediate compassionate release under 18 U.S.C. § 3582(c), U.S.S.G. §1B1.13, and BOP Policy Statement 5050.50.

On December 21, 2018, the President signed into law the First Step Act. Among other things, the Act changed the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i), to broaden courts' authority to grant such relief.

Before the First Step Act, compassionate release motions could only be brought on behalf of a prisoner by the Director of the Bureau of Prisons. But for over three decades, the BOP rarely did so.[15] Now, the statute empowers courts to reduce a defendant's sentence whenever "extraordinary and compelling reasons warrant such a reduction," and the reduction follows the sentencing factors outlined in 18 U.S.C. § 3553(a) and applicable policy statements issued by the Commission—regardless of the BOP's position. *See, e.g.*, *United States v. Cantu*, 2019 WL 2498923, at *3-4 (S.D. Tex. June 17, 2019) (vesting BOP with authority to determine whether extraordinary and compelling reasons are present "no longer describes an appropriate use of sentence-modification provisions and is thus not part of the applicable policy statement binding the Court"); *United States v. Ebbers*, 2020 WL 91399, at *4 n.6 (S.D.N.Y. Jan. 8, 2020) ("[T]he First Step Act reduced the BOP's control over compassionate release and vested greater discretion with courts. Deferring to the BOP would seem to frustrate that purpose.").

Section 1B1.13 of the United States Sentencing Guidelines is the applicable Guidelines provision. Based on this section, a sentence reduction is warranted when "extraordinary and compelling reasons" are present and the defendant is not a danger to the community. U.S.S.G. § 1B1.13. This Guidelines provision has not been updated to reflect the changes created by the First

---

[15] *See, e.g.*, Dep't of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (April 2013), at 11, available at *https://oig.justice.gov/reports/2013/ e1306.pdf* ("The BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."); Dep't of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015), at 51, available at https://oig.justice.gov/reports/2015/e1505.pdf ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it."); U.S.S.G. § 1B1.13, n.4 (admonishing BOP for its past failure to pursue relief on behalf of eligible inmates).

Step Act, nor was it drafted to account for the extraordinary circumstances surrounding COVID-19. But it provides some guidance on what "extraordinary and compelling" reasons entail:

- "suffering from a serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," or

- "Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," the reasons described in the policy statement note.

U.S.S.G. §1B1.13, comment. n.1(A)(ii)(I), (D).[16]

Since the First Step Act took effect, courts have embraced their broad discretion under § 3582(c)(1)(A) to grant compassionate release, and have found "extraordinary and compelling reasons" to do so in circumstances beyond the few (age, medical condition, and family needs) the BOP traditionally relied on or are listed in §1B1.13.[17] Because the First Step Act meant "to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it." *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019). Thus, the Director's prior interpretation of "extraordinary and compelling"

---

[16] Even under U.S.S.G. §1B1.13, comment. (n.1), Mr. Escamilla's COVID-19 infection is a "serious medical condition" "that substantially diminishes [his] ability to provide self-care within the environment of a correctional facility from which he . . . is not [potentially] expected to recover" based on the data widely surrounding high-risk individuals and COVID-19. And, as will be demonstrated in subsections B and C of this motion, the § 3553(a) factors in this case warrant compassionate release. Finally, Mr. Escamilla does not pose a danger to the community. Thus, even under the Guidelines provisions, Mr. Escamilla qualifies for compassionate release.

[17] *See United States v. Muniz*, No. 4:09-CR-199-1, 2020 WL 1540325, at *1 (S.D. Tex. Mar. 30, 2020); *United States v. Owens*, No. 97-CR-2546-CAB, ECF No. 93 at 4 (S.D. Cal. Mar. 20, 2020); *United States v. Redd*, No. 1:97-cr-0006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020); *United States v. Perez*, No. 88-10094-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020); *United States v. Young*, No. 2:00-cr-0002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020); *United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020); *Maumau*, 2020 WL 806121, at *3; *United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8. 2020); *United States v. Valdez*, No. 3:98-cr-0133-01-HRH, 2019 WL 7373023, at *2 (D. Alaska Dec. 31, 2019); *United States v. Rodriguez*, No. 17-cr-00021-WHO-1, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019); *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Walker*, No. 1:11 CR 270, 2019 WL 5268752, at *2 (N.D. Ohio Oct. 17, 2019); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *5-6, 8-9 (M.D.N.C. June 28, 2019); *United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019); *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *5 (S.D. Tex. June 17, 2019).

is not dispositive. *Id.* "While Sentencing Commission and BOP criteria remain helpful guidance, the amended [compassionate-release statute] vests courts with independent discretion to determine whether there are 'extraordinary and compelling reasons' to reduce a sentence." *United States v. Decator*, Crim. No. CCB-95-0202, 2020 WL 1676219, at *3 (D. Md. Apr. 6, 2020); *see also United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *2 (D. Utah Feb. 18, 2020) (collecting cases and joining the majority of district courts to find the court is not bound to the outdated policy statement).[18]

Courts all over the country are quickly recognizing that the current laws, Guidelines, and procedures were not meant to address this novel pandemic situation. For instance, in *United States v. Gross*, the Court noted:

> It is now nearly beyond cavil that the combination of the COVID-19 pandemic and Mr. Gross's health conditions constitute an extraordinary and compelling reason warranting a reduction of his sentence. The COVID-19 pandemic is "extraordinary and unprecedented in modern times in this nation." *United States v. Butler*, No. 19-CR-834-10 (PAE) 2020 WL 1689778, at *2 (S.D.N.Y. Apr. 7, 2020). As discussed in the Court's April 6 Opinion and Order, Mr. Gross suffers from several health conditions, at least one of which places him at a higher risk for severe illness if he contracts COVID-19. *See* Dkt. No. 758 at 1. Moreover, not only is he at a higher risk of serious illness if he contracts COVID-19 due to his underlying health conditions, but he is also at a higher risk of *contracting* COVID-19 due to his incarceration. "**And, realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself.**" *Butler*, 2020 WL 1689778, at *2. For these reasons, numerous courts have recently concluded that "extraordinary and compelling reasons" exist for purposes of the policy statement where inmates suffer from medical conditions that place them at a higher risk of serious illness in the event they contract COVID-19. *See, e.g.*, *United States v. Zukerman*, No. 16-cr-194 (AT), 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (collecting cases). Accordingly, this factor favors Mr. Gross's early release.

No. 15-CR-769 (AJN), 2020 WL 1862251, at *3 (Apr. 14, 2020) (emphasis added).

---

[18] "[A] majority of district courts have concluded that the 'old policy statement provides helpful guidance, [but] … does not constrain [a court's] independent assessment of whether "extraordinary and compelling reasons" warrant a sentence reduction under § 3582(c)(1)(A)." *United States v. Rodriguez*, No. 2:03-CR-271-AB-1, 2020 WL 1627331, at *4 (E.D. Pa. Apr. 1, 2020) (citing *United States v. Beck*, ---F.3d---, No. 13-CR-186-6, 2019 WL 2716505 (M.D.N.C. June 28, 2019).

## II.     Mr. Escamilla's sentence.

In 2009, Mr. Escamilla pleaded guilty to one count of conspiracy to distribute and possess with intent to distribute over five kilograms of cocaine. The offense did not involve a gun or violence. In June 2009, he was sentenced to 240 months' imprisonment to be followed by a five-year term of supervised release. *See* Doc. 973. In October 2015, the Court reduced his sentence to 192 months based on the retroactive application of the U.S. Sentencing Commission's guidance. *See* Doc. 1245. Mr. Escamilla sought compassionate release in 2018 and 2019 based on his diabetes, hypertension, anemia, and vulnerabilities as double amputee confined to a wheelchair. *See* Docs. 1254 and 1286.  Both of his requests for compassionate release were denied. *See* Docs. 1255 and 1289.  More recently, after COVID-19 struck FCI Oakdale, U.S. Probation denied the BOP's request to provide location monitoring services for Mr. Escamilla while under home confinement.

## III.     The extraordinary and compelling circumstances here—especially Mr. Escamilla's age, serious poor health, and battle with COVID-19, which render him particularly vulnerable in prison—warrant his immediate release.

Under 18 U.S.C. § 3582(c)(1)(A)(i), Mr. Escamilla asks the Court to summon its mercy and compassion and find that extraordinary and compelling circumstances exist to warrant a sentence of time-served. He makes this request based on the COVID-19 pandemic, his own battle with COVID-19, his poor health, and § 3553(a) factors that make him the type of offender Attorney General Barr advised BOP to release.[19] Furthermore, BOP recognized Mr. Escamilla as someone eligible for home confinement. That plan to release Mr. Escamilla should be expedited by his having contracted COVID-19, not hindered by it.

---

[19]  William Barr, United States Attorney General, *Memorandum for Director of Bureau of Prisons* (Mar. 26, 2020), available at https://www.justice.gov/file/1262731/download (last accessed Apr. 20, 2020).

A.    **The COVID-19 pandemic presents "extraordinary and compelling reasons" that justify compassionate release.**

The world has changed dramatically in the past few months. On March 11, 2020, the World Health Organization classified the spread of COVID-19 as a pandemic.[20] On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency under the National Emergencies Act, 50 U.S.C. §§ 1601 et seq.[21] Several days later, the White House issued guidance recommending that gatherings of *ten or more* persons be canceled or postponed.[22]

As of April 24, 2020, nearly *2.7 million* people have been infected globally and over 194,000 people have died. In the United States alone, nearly 884,000 people have been infected and over 50,000 people have died.[23] These numbers, which increase sharply each day, underrepresent the true scope of the crisis in the United States considering the low rate of testing.

To stem the spread of the disease, the CDC has broadly advised people to take basic preventive actions, such as avoiding crowds, staying six feet away from others, keeping surfaces disinfected, and frequently washing their hands or using hand sanitizer.[24] Even if those showing symptoms are quarantined, health experts are recommending social distancing on a much broader scale because "there is still a significant number of people who transmit that are asymptomatic."[25]

---

[20] *Coronavirus: COVID-19 Is Now Officially A Pandemic, WHO Says*, The Coronavirus Crisis (March 11, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/11/814474930/coronavirus-covid-19-is-now-officially-a-pandemic-who-says (last accessed Apr. 20, 2020).

[21] The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020), available at *https://www.whitehouse.gov/presidential-actions/proclemation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/*.

[22] Sheri Fink, "White House Takes New Line After Dire Report on Death Toll," *New York Times* (March 17, 2020), available at *https://www.nytimes.com/2020/ 03/17/us/coronavirus-fatality-rate-white-house.html?action=click&module= Spotlight&pgtype=Homepage*.

[23] "COVID-19 Coronavirus Pandemic," available at *https://www.world ometers.info/coronavirus*.

[24] Centers of Disease Control and Prevention, *Coronavirus Disease 2019*, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[25] Dr. Angela Baldwin and Sony Salzman, *What we know and don't about asymptomatic transmission and coronavirus* (April 1, 2020), https://abcnews.go.com/Health/asymptomatic-transmission-coronavirus/story?id=69901758 (last accessed Apr. 20, 2020).

Public health experts have warned that incarcerated individuals "are at special risk of infection" and are "less able to participate in proactive measures to keep themselves safe."[26] The conditions in BOP facilities provide a uniquely hospitable environment for COVID-19 to spread.[27] Before March 13, 2020, when the BOP suspended visits for 30 days, inmates regularly engaged in social, legal, and medical visits with people in the community at a time when the novel coronavirus already began to spread.[28] To this day, inmates must share communal living spaces, such as cells, restrooms, recreation rooms, dining halls, libraries, and exercise yards. To make matters worse, hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission, is deemed forbidden "contraband" in BOP facilities because of its alcohol content.[29]

Recognizing the unique risks that correctional facilities pose to both inmates and employees, members of Congress asked the BOP on March 19, 2020, to allow for the immediate release of elderly, non-violent inmates.[30] The following week, Attorney General Barr urged the Director of the BOP to prioritize home confinement for such individuals who are elderly, housed in low- or minimum-security facilities, and otherwise vulnerable or eligible.[31]

---

[26] "Achieving a Fair and Effective COVID-19 Response:  An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020), at *https://bit.ly/2W9V6oS*.

[27] Joseph A. Bick, "Infection Control in Jails and Prisons*," Clinical Infectious Diseases* 45(8): 1047-1055 (2007), available at *https://doi.org/10.1086/521910*; Vice, "Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits" (Mar. 24, 2020), available at *https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits*.

[28] "Federal Bureau of Prisons Covid-19 Action Plan," available at *https://www.bop.gov/resources/news/20200313_covid-19.jsp*.

[29] Keri Blakinger and Beth Schwarzapfel, "How Can Prisons Contain Coronavirus When Purell is Contraband?*," ABA Journal* (March 13, 2020), available at *https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus*.

[30] Letter of Representatives Jerrold Nadler and Karen Bass (March 19, 2020), https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/5.24.18%20hjc%20dems%20letter%20to%20potus.pdf (last accessed Apr. 20, 2020) ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

[31] William Barr, United States Attorney General, *Memorandum for Director of Bureau of Prisons* (Mar. 26, 2020), available at https://www.justice.gov/file/1262731/download (last accessed Apr. 2, 2020).

Despite the BOP's efforts to take precautionary measures, they are woefully unprepared to contain the virus's spread. This is documented by Oakdale's staff who filed a lawsuit seeking to force hazard pay.[32] In an interview with the New York Times, a correctional officer at FCI Oakdale and the President of the American Federation of Government Employees Local 1007 stated, "You got the director of the B.O.P. saying they've been preparing since January, and they have a national stockpile of supplies. Well, where the hell are those supplies? Why can't we get some? They did send us some national-stockpile N95 masks. Want to know how many? Two hundred! Two hundred! They couldn't afford to give us any more."[33] The COVID-19 pandemic alone presents an "extraordinary and compelling" reason for this Court to grant Mr. Escamilla's request for the relief he seeks, and his entitlement to relief is made even more clear by his incarceration at Oakdale where even the staff is outraged at the lack of supplies, equipment, and proper direction.[34] And, in fact, Courts have granted compassionate release to inmates housed at Oakdale FCI based on the likelihood of becoming infected with COVID-19. *See e.g. United States v. Kirk Lawrence Brannan*, No. 4:15-CR-80, Doc. 286 (S.D. Tex. Apr. 2, 2020) (granting emergency release for Mr. Brannan because he is 66 years old, at high-risk of contracting COVID-19, and has high blood pressure and high cholesterol making him a high-risk individual); *United States v. Tran*, No. 08-CR-197-DC, 2020 WL 1820520 (C.D. Cal. Apr. 10, 2020).

The number of staff and inmates within the BOP who have tested positive for COVID-19 has nearly doubled every few days over the past week. Since the beginning of this crisis, 24

---

[32] Complaint, *Braswell v. United States of America,* Civil Action No. 20-cv-539C  (Fed. Cl Mar. 27, 2020), *available at* https://www.classaction.org/media/braswell-et-all-v-the-united states-of-america.pdf (last accessed Apr. 23, 2020).

[33] *See* Janet Reitman, *'Something is Going to Explode': When Coronavirus Strikes a Prison* (Apr. 18, 2020), https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html (last accessed Apr. 19, 2020) (documenting the coronavirus outbreak at FCI Oakdale, including the staff and inmates observations regarding lack of directive, protocol, and equipment).

[34] *Id.*

COVID-19 infected federal inmates have died. In the alarming crisis unfolding, the universally recommended antidote is simple: reduce the prison population.[35]  Mr. Escamilla should have been released weeks earlier.[36] Attorney General Barr issued a directive to the BOP to release low-level elderly and high-risk inmates on March 26.  Then on March 28, US Probation categorically denied the BOP's request to monitor Mr. Escamilla's home confinement.

Courts are increasingly heeding the call from legal and medical experts by releasing inmates from overcrowded facilities even for individuals who are not as ill or incapable of engaging in basic self-care as Mr. Escamilla. For example, in *United States v. Collins*, the court reduced the defendant's sentence to time-served and ordered his immediate release, stating:

> Finally, the court must acknowledge the extraordinary circumstances present in the community as a result of the COVID-19 pandemic. It is well established by public health authorities that efforts should be made to permit social distancing and minimize the risks of transmission through close contact. While it has not been proffered that Collins has an underlying health condition which makes him more susceptible to the effects of the virus, and while the risks posed by a defendant's continued residence in a detention facility do not necessarily mandate release when weighed against all the factors the court must consider, here we have, as described above, a non-violent drug offender who has already served a lengthy sentence and has been determined ready for community placement at the VOA. Collins has a home ready to receive him, where he can be placed on home confinement. While traditional location monitoring (an ankle bracelet) is not currently available, other methods of monitoring may be implemented in the discretion of the Probation Office.

*United States v. Collins*, No. 1:10-CR-336-CCB-20, 2020 WL 1506176 at *2 (D. Md. Mar. 30, 2020). Similarly, in *United States v. Foster*, No. 1:-CR-324-02, ECF No. 191 (M.D. Pa. Apr. 3,

---

[35] *See, e.g.* Kennedy, Merrit, *U.N. Calls for Countries to Reduce Prison Populations*, https://www.npr.org/sections/coronavirus-live-updates/2020/03/25/821417365/u-n-calls-for-countries-to-reduce-prison-populations (last accessed Apr. 22, 2020).
[36] *See See* Janet Reitman, *'Something is Going to Explode': When Coronavirus Strikes a Prison* (Apr. 18, 2020), https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html (last accessed Apr. 19, 2020) (documenting interview with Kirk Brannan).

2020), the Court released a person with chronic lung disease based on COVID-19. The court noted

it was important "to remain the civilized society we hold ourselves out to be" and release a person

with health conditions where "a COVID-19 diagnosis [could equate] a death sentence." *Id. Collins*

and *Foster* are far from alone.[37]

---

[37] *See, e.g., Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpub.) (sua sponte releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); *United States v. Coker*, No. 3:14-CR-085 (RLJ), 2020 WL 1877800 (E.D. Tenn. Apr. 15, 2020) (releasing defendant who suffers from COPD and emphysema and who depends on oxygen and wheelchair and whose condition had gradually worsened during incarceration, noting that they constituted extraordinary and compelling reason for sentence reduction even without consideration of the pandemic); *United States v. Sawicz*, No. 08-CR-287 (ARR), 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020) (finding that for a defendant suffering from hypertension in a facility with an outbreak, "the risk of serious illness or death that he faces in prison constitutes an extraordinary and compelling reason militating in favor of his release."); *Miller v. United States*, No. 16-CR-20222-1, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020) (releasing 69-year old defendant suffering from coronary artery disease, COPD, hypertension, Hepatitis C, liver cancer, heart disease, and cirrhosis, who "squarely fits the definition of an individual who has a higher risk of falling severely ill from COVID-19."); *USA v. Trent*, No. 16-CR-00178-CRB-1, 2020 WL 1812242 (N.D. Cal. Apr. 9, 2020), *adhered to*, No. 16-CR-00178-CRB-1, 2020 WL 1812214 (N.D. Cal. Apr. 9, 2020) (releasing defendant with no violent history diagnosed with HIV/AIDS diabetes and obesity, and finding "in the context of the COVID-19 pandemic, these medical conditions, which render Trent uniquely vulnerable to serious illness if he contracts COVID-19, substantially diminish his ability to provide self-care within the environment of a correctional facility.") (citation omitted); *United States v. Plunk*, Case No. 3:94-cr-36-TMB (D. Alaska Apr. 9, 2020) (granting compassionate release in light of COVID-19); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (granting compassionate release to 65-year old defendant suffering from COPD and asthma, and with a history of pneumonia and lung infection); *United States v. Zukerman*, No. 16-CR-194 (AT), 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020) (waiving exhaustion requirement in light of extraordinary threat posed by COVID-19 pandemic and finding defendant's "age, combined with his diabetes, hypertension, and obesity, satisfy" the extraordinary and compelling requirement); *United States v. Brannan*, No. 4:15-CR-80-01 (LHR), 2020 WL 1698392 (S.D. Tex. Apr. 2, 2020) (ordering release of defendant incarcerated at FCI Oakdale II and suffering from high blood pressure and high cholesterol); *United States v. Colvin*, No. 3:19CR179 (JBA), 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (releasing defendant with diabetes and high blood pressure who was deeemed "unable to provide self-care within the environment of FDC Philadelphia in light of the ongoing and growing COVID-19 pandemic because she is unable to practice effective social distancing and hygiene to minimize her risk of exposure, and if she did develop complications, she would be unable to access her team of doctors at Bridgeport Hospital."); *United States v. Perdigao*, No. CR 07-103, 2020 WL 1672322 (E.D. La. Apr. 2, 2020) (releasing inmate due to inability to provide self-care while incarcerated for his serious and debilitating heart condition); *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020) (releasing defendant diagnosed with diabetes, high blood pressure, and liver abnormalities, and who had shown significant rehabilitation during his incarceration); *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155 (E.D. Wash. Mar. 31, 2020) (releasing defendant housed in county jail and finding "[s]he is in the most susceptible age category (over 60 years of age) and her COPD and emphysema make her particularly vulnerable."); *United States v. Muniz*, No. 4:09-CR-0199-1 (KPE), 2020 WL 1540325 (S.D. Tex. Mar. 30, 2020) (releasing defendant who suffered from end stage renal disease, diabetes, and arterial hypertension, and whose mobility was significantly hindered by a foot amputation); *United States v. Powell*, No. 1:94-CR-00316 (ESH), 2020 WL 1698194 (D.D.C. Mar. 28, 2020) (granting defendant's unopposed motion for compassionate release where defendant "is 55-years-old, suffers from several respiratory problems (including sleep apnea and asthma), and has only 3 months remaining on his 262-month sentence.").

**B.      The § 3553(a) factors warrant a reduced or modified sentence.**

Under § 3582(c)(1)(A)(i), when a defendant establishes the existence of extraordinary and compelling circumstances justifying compassionate release, courts must consider the relevant 18 U.S.C. § 3553(a) sentencing factors to determine whether a sentencing reduction or modification is warranted. Here, Mr. Escamilla's health concerns—diabetes, high blood pressure, anemia, paraplegia, and now COVID-19 infection—combined with other § 3553(a) sentencing factors warrant a reduced and/or modified sentence to time-served.

The need to release Mr. Escamilla is acute. As predicated by science, data, and statistics, he has already become infected by COVID-19 and has been hospitalized because of that infection. Other district courts have found a COVID-19 diagnosis to be sufficient reason to grant compassionate release. *See e.g. United States v. Razzouk*, No. 1:11-cr-00430 (ARR) (E.D.N.Y. Apr. 19, 2020).  In *Razzouk*, the defendant suffered from COPD and contracted COVID-19 while incarcerated. The BOP transferred him to isolation when he began showing symptoms of the virus and made plans to release him to home confinement following his quarantine. The court reasoned that that was insufficient, ordering the defendant released to home confinement immediately, noting that having tested positive for COVID-19 made his situation even more urgent than other similar cases. The court noted in its findings that the quarantine and isolation protocols implemented by the BOP had failed to protect the inmate from exposure and that the defendant's family and attorney had had significant communications problems while he was in isolation, just as in this case. *Id*. As in *Razzouk*, Mr. Escamilla's diagnosis is of urgent concern, both because of the risks to himself and to the other inmates at Oakdale. And because so little is known about COVID-19,

doctors cannot say for certain that Mr. Escamilla does not risk reinfection if returned to the Oakdale facility.[38]

Additionally, his hospitalization presents a greater risk of complication because he is diabetic.[39] A study published April 22 in the Journal of the American Medical Association found, "Of the patients who died, those with diabetes were more likely to have received invasive mechanical ventilation or care in the ICU compared with those who did not have diabetes."[40] And, "[t]he percentage of patients who developed acute kidney injury was increased in the subgroups with diabetes compared with the subgroups without these conditions."[41] These findings make it imperative that Mr. Escamilla be released should he survive hospitalization. The BOP has already demonstrated that it is not equipped to handle these types of serious medical complications.

The 18 U.S.C. § 3553(a) factors weigh heavily in favor of reducing Mr. Escamilla's sentence to time-served, as this sentence will be "sufficient but not greater than necessary" to fulfill the objectives of sentencing.  Mr. Escamilla is not a danger to the community so public safety will not be at risk—he is confined to a wheel-chair, is seriously ill, and at serious risk of death.  He has a supportive family. Importantly, a release plan is in place and Mr. Escamilla can live with his family in Round Rock.  Placement with family will limit the spread of COVID-19 to other inmates and eliminate the risk of reinfection to him.  Furthermore, modifying his sentence to time-served will allow his family to participate with his medical care.  The serious changes in Mr. Escamilla's health since his last request for compassionate release warrant the relief he seeks here.

---

[38] *See, e.g.* Park, William, *Immunity to Covid-19 is not as clear cut as we might hope—but understanding who is immune and why will be key to finding a treatment*, (Apr. 22, 2020) https://www.bbc.com/future/article/20200421-will-we-ever-be-immune-to-covid-19 (noting that "in practice we don't know how people might react to reinfection a second time.")

[39] Safiya Richardson MD, MPH; Jamie S. Hirsch, MD, MA, MSB, et al. *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, JAMA (Apr. 22, 2020), available at https://jamanetwork.com (last accessed Apr. 23, 2020).

[40] *Id.* at p. E6

[41] *Id.*

**IV.     This Court has the authority to reduce or modify Mr. Escamilla's sentence by waiving the exhaustion requirement, based on extraordinary circumstances.**

Under 18 U.S.C. § 3582(c)(1)(A), a defendant ordinarily must exhaust administrative remedies with the BOP or wait 30 days after submitting a request for compassionate release to the warden, whichever comes first. 18 U.S.C. § 3582(c)(1)(A). But these times are without precedent and this individual is uniquely vulnerable. The court may waive these administrative exhaustion requirements and should do so here. *See, e.g., Garner v. U.S. Dept. of Labor*, 221 F.3d 822, 825 (5th Cir. 2000) (recognizing a failure to exhaust administrative remedies may be excused "when claimant advances a constitutional challenge unsuitable for determination in an administrative proceeding, or when the unexhausted remedy is plainly inadequate"); *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004) (under Prison Litigation Reform Act, 42 U.S.C. § 1997e, where the prisoner "did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements," permitting the court to waive the failure to exhaust) (quotation marks and citations omitted).

Courts throughout the country have continued to waive the administrative exhaustion requirements under the First Step Act, where circumstances warrant.[42]   In the compassionate release context, courts have recognized that under circumstances similar to the ones presented

---

[42] *See Washington v. Bur. of Prisons*, No. 1:19-CV-01066, 2019 WL 6255786, at *2 (N.D. Ohio July 3, 2019) (in addressing motion for recalculation of good time credit under the First Step Act, the court explained that "[t]he failure to exhaust administrative remedies may be excused if seeking administrative remedies would be futile."); *United States v. Walker*, No. 3:10-cr-00298-RRB-1, ECF 110 (D. Or. Feb. 7, 2019) (finding that, although the defendant failed to exhaust administrative remedies, the Court had jurisdiction to order recalculation of defendant's good time credit under the First Step Act and to order defendant's release if his term of imprisonment had expired); *see also Gurzi v. Marques*, No. 0:18-CV-03104, 2019 WL 6481212, at *2 (D. Minn. Oct. 10, 2019) (despite prisoner's failure to exhaust administrative remedies, addressing the merits of prisoner's objections to his designation, in part under the First Step Act, as "the Court observes that it has the authority to proceed to the merits of the case rather than rely on a failure to exhaust when appropriate.").

here, seeking relief from BOP may be futile, warranting the waiver of a defendant's failure to exhaust administrative remedies—including because of COVID-19.[43] Courts also excuse exhaustion requirements if an administrative appeal would be futile or because the appeals process is inadequate to prevent irreparable harm to the defendant. The risk of irreparable harm caused by delay to a diabetic such as Mr. Escamilla is high.

And waiver of the 30-day waiting period is appropriate because the Government has conceded in other parts of the country that the exhaustion requirement in § 3582(c)(1)(A) is a non-jurisdictional requirement that can be waived. *See, e.g.*, *United States v. Gentille*, No. 19-CR-590, Doc. 31 (S.D.N.Y. Apr. 6, 2020) (Government conceding that the 30-day waiting period can be waived and that it is a non-jurisdictional requirement); *United States v. Roberts*, No. 18-CR-528-5, 2020 WL 1700032, at *1 (S.D.N.Y. Apr. 8, 2020) (same); *United States v. Jasper,* No. 18-CR-390 (PAE), Doc. 440 (S.D.N.Y. Apr. 10, 2020) (same); *United States v. Knox*, No. 15-CR-445 (PAE), Doc. 1086 (S.D.N.Y. Apr. 10, 2020) (same).

Even where the Government has not agreed to bypass the 30-day waiting period, courts have judicially waived the non-jurisdictional waiting period because this pandemic is a matter requiring courts to act in an urgent manner.  *See, e.g.*, *United States v. Smith*, No. 12-CR-133 (JFK), 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020) ("[T]he First Step Act did not empower the Government with the sole authority to decide when and under what conditions exhaustion must be waived, and it agrees with certain of its sister courts that judicial waiver is permissible in light

---

[43] *See, e.g.*, *United States v. Colvin*, No. 3:19CR179 (JBA), 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (finding exhaustion requirement excused for COVID-19-related motion because it would be futile, result in "catastrophic health consequences," and subject inmate to undue prejudice); *United States v. Powell*, No. 1:94-cr-316-ESH (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust remedies in light of open misdemeanor case).

of the extraordinary threat certain inmates face from COVID-19.").[44] In concluding this, courts have recognized that the purpose of the First Step Act's modifications to § 3582 was to ensure that inmates obtained meaningful judicial review promptly. *United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020) ("[T]he plain language of Section 3582(c) evinces congressional intent that a defendant has a right to a prompt and meaningful judicial determination of whether she should be compassionately released, regardless of whether administrative remedies have been exhausted."). Given that the entire purpose of the modification to § 3582(c) was to give an inmate meaningful judicial review, regardless of what the BOP determines of his or her request for compassionate release, it would be illogical to use that 30-day time-frame to prevent relief, especially during a pandemic. The statistical likelihood that Mr. Escamilla will suffer a bad outcome underscores the need for the Court to take urgent action on his request.

Those circumstances are present here more so than the cases cited above. The relief Mr. Escamilla seeks is needed now. Waiting 30 days for the administrative clock to run could likely render any relief moot given Mr. Escamilla's unique circumstances.[45]

## V.      Consultation

Assistant U.S. Attorney Mark Marshall, who represents the Government in this matter, has been consulted. He advised that his office is currently undertaking review of Mr. Escamilla's request and is not able to respond immediately. The matter is currently under review.

---

[44] While many courts have ruled that the 30 days is waivable and/or excusable, other courts have declined to find such an exception. *See e.g. United States v. McCann*, No. 5:13-CR-52, 2020 WL 1901089 (E.D. Ky. Apr. 17, 2020).

[45] Alternatively, at least one court has found that where a defendant previously sought compassionate release on "the same fundamental grounds as the instant motion," that it could satisfy the exhaustion requirement in the COVID-19 context. *United States v. Coker*, 3:14-CR-085 (RLJ) (E.D. Tenn. Apr. 15, 2020).  Here, Mr. Escamilla sought compassionate release based on numerous of the same underlying conditions in 2018 and 2019.

## CONCLUSION

For all the reasons stated above, Mr. Escamilla asks the Court to reduce his sentence to time-served, followed by a 5-year term of supervised release.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

/s/ JOSE GONZALEZ-FALLA
Assistant Federal Public Defender
Western District of Texas
594 Lavaca Street, Ste. 960
Austin, Texas 78701-2860
Phone: (512) 916-5025
Fax: (512) 916-5035
Bar No: 8135700

*Attorney for George Lewis Escamilla, Sr.*

19

## CERTIFICATE OF SERVICE

I certify that on the 24th day of April, 2020, I electronically filed Emergency Motion for

Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) with the Clerk of Court using the

CM/ECF system and the system will email notification of such filing to:

Mark Marshall
Assistant United States Attorney
903 San Jacinto Blvd., Suite 334
Austin, Texas 78701

/s/ JOSE GONZALEZ-FALLA

*Attorney for George Lewis Escamilla, Sr.*

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CAUSE NO. 1:08-CR-337-LY-1 |
| | § | |
| GEORGE LEWIS ESCAMILLA, SR. | § | |

**ORDER**

Defendant's emergency motion for reduction in sentence, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), is **GRANTED**.

Defendant is resentenced to a term of time-served, followed by a term of five years supervised release.

**SO ORDERED** on this the _____ day of _____, 2020.

_____
LEE YEAKEL
United States District Judge